## Case No. 7,100.

### The ISABELLA.

[Brown. Adm. 96;[1] 2 West. Law Month. 252.]

District Court, N. D. Ohio. March, 1860.

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

Willey & Carey and J. C. Vail, for libellant.
Ranney, Backus & Noble, for claimants.

WILLSON, District Judge. "There are some principles of law," said Chief Justice Taney, in the case of The Royal Saxon [Case No. 12,098], "which have been so long and so well established, that it is sufficient to state them without referring to authorities. The lien of seamen for their wages is prior and paramount to all other claims on the vessel, and must be first paid. By the constitution and laws of the United States, the only court that has jurisdiction over this lien, or authorized to enforce it, is the court of admiralty, and it is the duty of that court to do so. The seamen, as a matter of right, are entitled to the process of the court to enforce payment promptly, in order that they may not be left penniless, and without the means of subsistence on shore. And the right to this remedy is as well and as firmly established as the right of the paramount lien. No court of common law can enforce or displace this lien. It has no jurisdiction over, nor any right to obstruct or interfere with the lien, or the remedy which is given, by the constitution and acts of congress, to the courts of admiralty to enforce it." As early as 1792, the district court of Pennsylvania, in the case of Jennings v. Carson [Case No. 7,281], decided that congress, by the act of 1789 [1 Stat. 73], meant to convey to the district courts all the powers appertaining to admiralty and maritime jurisdiction, including that of prize. And whatever doubts then existed as to the real import of the act of 1789, were seemingly dissipated in 1794, by the decision of the supreme court in the case of Glass v. The Betsey, 3 Dall. [3 U. S.] 6, which declared that the district courts possessed all the powers of courts of admiralty, including, as we suppose, all the remedies incident to that jurisdiction.

Chancellor Kent, in his Commentaries, says that "whatever admiralty and maritime jurisdiction the district courts possess, would seem to be exclusive, for the constitution declares that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction; and the act of congress of 1789 provides that the district courts shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction." 3 Kent, Comm. 337. This broad construction of the admiralty power was supposed to be justified on the authority of the case of Martin v. Hunter, 1 Wheat. [14 U. S.] 304, where it is said that "the words 'judicial power shall extend,' &c., were imperative, and that congress could not vest any portion of the judicial power of the United States, except in courts ordained and established by itself." But more recently, this doctrine has been somewhat restricted in its application. Judge Story has given an interpretation to the constitution not precisely in accordance with previous adjudged cases. He says, "The admiralty and maritime jurisdiction was intended by the constitution to be exactly as extensive or exclusive, and no more so, in the national judiciary, than it existed in the jurisdiction of the common law; and that where the cognizance of admiralty and maritime cases was previously concurrent in the courts of common law, it remains so." Story, Const. 535. And this interpretation of the constitution was referred to with approbation by Mr. Justice Campbell, in giving the opinion of a majority of the court in the late case of The Royal Saxon. So that we suppose, the authoritative doctrine, as to the concurrent jurisdiction of the state courts of cases cognizable in the admiralty, is this: The state courts may exercise the jurisdiction in cases of which the cognizance was concurrent in the courts of common law previous to the adoption of the constitution; and this is the full extent of the concurrent authority of the state courts; and further than this those courts have no power to act in such cases.

On a contract for mariner's wages, the seaman, who has rendered the maritime service, may prosecute his suit against the mas-

ter or the owner of the vessel, in the state courts, under the common law forms of process, and in the common law modes of procedure; because in this way a competent remedy is furnished according to the practice and usages of the common law. This is doubtless what was contemplated by congress, in the saving clause inserted in both the acts of 1789 [supra] and 1845 [5 Stat. 726], to wit: "Saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." This is a concurrent remedy with that which the seaman has in a court of admiralty, by process in rem against the vessel in virtue of his maritime lien, or by process in personam against the master upon the maritime contract. But the state legislature cannot confer admiralty jurisdiction upon the state courts, or . authorize admiralty proceedings in rem to enforce maritime liens. This power, by the constitution, is given to the general government, and its exercise confined exclusively within the jurisdiction of the federal courts.

It is, however, urged that a quasi admiralty proceeding in rem is authorized, to enforce a maritime lien in the state courts, by virtue of the additional saving clause in the act of congress of 1845, to wit: "And saving any concurrent remedy which may be given by the state laws, where such steamer or other vessel is employed in such business of commerce and navigation."

We had occasion, in the case of Revenue Cutter No. 1 [Case No. 11,713], recently decided, to notice the purpose and effect of this act of 1845, and to trace the authority by which it was passed, to the provision in the constitution which empowers congress "to regulate commerce with foreign nations, and among the several states." The framers of the law evidently proceeded with great caution, and with doubts and misgivings, as to the authority of congress to pass the act under the commercial power in the constitution. And, indeed, it would seem inconsistent with the ordinary meaning of words, to call a law, defining the jurisdiction of the district courts, a regulation of commerce. The jurisdiction of the courts, and the regulation of commerce, are separate and distinct matters, having no necessary connection with, or dependence on each other. And the fixed constitutional limits to the judicial authority of the federal courts would seem to form an insuperable objection to this law, if its validity is made to depend upon the commercial power. It was evidently this apprehension of the want of authority in congress to pass the act, and the consequent difficulties anticipated .in the prosecution of suits under it, that induced the insertion of the provisions in relation to the trial of facts by a jury, and the reservation to the state courts of the cognizance of cases that might (in matters of doubt) come under their jurisdiction. It is very clear that this law was not intended to recognize, in the state courts, the right, or to confer upon them the power to exercise admiralty and maritime jurisdiction; and for the simple reason that congress, under the constitution, has no authority to make the grant.

We now proceed to inquire into the effect of the libellant's suit and judgment in the state court. Do those proceedings preclude his right to prosecute his claim and enforce his lien in a court of admiralty? The libellant obtained his judgment in the state court under and by virtue of the act of the general assembly of the state of Ohio of February, 1840, entitled "An act to provide for the collection of claims against steamboats and other water crafts, and authorizing proceedings against the same by name." 38 St. 34. The first section of this law designates for what and whose account steamboats and other water crafts navigating the waters within and bordering upon this state, shall be liable, and as substantially re-enacted by an amendatory act of April 12, 1858, reads as follows: "That steamboats and other water crafts, navigating the waters within, or bordering upon this state, shall be liable, and such liability shall be a lien thereon, for debts contracted on account thereof, by the master, owner, steward, consignee, or other agent for material, supplies or labor in the building, repairing, furnishing, insuring or equipping the same, or due for wharfage, and also for any damages arising out of any contract for the transportation of goods or persons, or for injuries done to persons or property by such craft, or for any damage or injury done by the captain, mate or other officer thereof, or by any person under the order or sanction of either of them to any person who may be a passenger or hand on such steamboat or other water craft at the time of the infliction of such damage or injury; provided, that the lien by this section created shall only attach to vessels of twenty tons burden and upwards, enrolled and licensed for the coasting trade, according to the act of congress." The second section provides, that any person having such demand may proceed against the owner or master, or against the craft itself; and the fourth section provides, that when proceedings are had against the craft itself, the process shall be by warrant of seizure. The act of March, 1848, explanatory of this statute, declares that it shall be competent for a person holding a claim against any such vessel, to proceed against the vessel by name, "notwithstanding the cause of action may have accrued beyond or out of the territorial limits or jurisdiction of this state, and although such craft may not have been, at the time such cause of action accrued, navigating the waters within or bordering upon this state; provided, that no claim or cause of action arising or accruing beyond or out of the territorial limits or jurisdiction of this state (under the pro-

visions of the acts of which this is explanatory), shall be permitted to attach or operate to the prejudice of any bona fide purchaser of such craft not having notice of the existence of such claim or cause of action." 46 St. 78.

These acts of the general assembly of the state of Ohio are in derogation of the common law. They are without precedent as to forms of process, or in modes of proceeding in any practice or usage known to the common law. They afford remedies, which it is doubtess competent for the state legislature to give upon contracts, and in relation to torts affecting water crafts within the state, and which are not subject to the admiralty jurisdiction. But further than this, they can have no binding effect or legal operation. They can give the state courts no jurisdiction over the mariner's lien for his wages upon vessels engaged in commerce and navigation between different states, or those engaged in the foreign trade. They purport to give the state courts authority to proceed in rem, and to designate the order and priority of maritime liens in direct violation of the well-settled principles of the maritime law. They undertake to afford remedies which it is not competent for the common law to give, and those also which it is not within the province or jurisdiction of the state courts to enforce. Courts of admiralty are careful to see that the mariner's lien is not destroyed by the proverbial improvidence of the sailor. And as this lien is a paramount claim upon the vessel, whoever owns such vessel, or how often soever the ownership may be changed, wherever she may go, and whatever may befall her, so long as a plank remains of her hull, the seamen are the first creditors, and she is privileged to them for their wages. Nor can this lien be affected or destroyed by any proceedings of the common law courts. The purchaser, at a judicial sale under such proceedings, takes the property cum onere.

In the case of Poland v. The Spartan [Case No. 11,246], it was urged (as it has been insisted in this case), that where different creditors are each pressing their own rights against the vessel in different courts, the rule should be, to give precedence to those who first lay their hands on the fund. And this was urged upon the plea of preventing a conflict and collision of judicial authority. The learned judge of the district of Maine, in that case, held that, as the mariner's lien was privileged, its very essence was to give a preference over the general creditors of the debtor. And that if such be the claim of the seamen, the attachment (under the state process) only created a lien on the property subject to such prior incumbrance, and consequently could only create the right to hold the specific property after discharging the lien. So, too, in the case of Certain Logs of Mahogany [Id. 2.559]. Mr. Justice Story says, that "a suit in a state court, by an attachment under process of the property, can never be admitted to supersede the rights of a court of admiralty to proceed by a suit in rem to enforce the right against that property, to whomsoever it may belong." "The admiralty suit (he says) does not attempt to enter into any conflict with the state court, as to the just operation of its own process; but it merely asserts a paramount right against all persons whatever, whether claiming above or under that process." This doctrine is not at all contravened by the decisions of the supreme court in the cases of Hagan v. Lucas, 10 Pet. [35 U. S.] 400, and Taylor v. Carryl, 20 How. [61 U. S.] 583. The principle established by these cases is simply this: When property is seized by a sheriff, under process from a state court, so long as it remains in his possession thus acquired and held, it is in the custody of the law, and cannot be again seized when so held, upon process issuing from a court of another jurisdiction.

This is the full extent of the principle maintained by these cases. And in the latter case on the question of the right of the marshal to execute the process of seizure from the admiralty, and take a vessel thus held by the sheriff, the members of the court were very near evenly divided in opinion, four of the judges insisting that the admiralty process was paramount in authority, and should be executed, notwithstanding the vessel was, at the time, thus in the custody of the law. In the case before us, the libellant's claim for wages against the brig was not merged in the judgment obtained in the state court under the Ohio water-craft law. Nor was his lien in any way affected by those proceedings; and for the plain reason that his maritime lien was a right which the state courts had no authority to enforce by a proceeding in rem; nor was the lien itself a matter within the cognizance of those courts. And hence, the judgment was void for the want of jurisdiction in the court which rendered it. The exception to the claimant's answer must, therefore, be sustained. Decree for libellant.